IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| KISHA YVONNE DANIEL, | ) |
| | ) |
|    Appellant/Debtor, | ) |
| | ) |
| v. | ) CASE NO. 2:19-CV-00859-RAH |
| | )         (WO) |
| TITLEMAX OF ALABAMA, INC., | ) |
| | ) |
| | ) |
|    Appellee. | ) |

**MEMORANDUM OPINION AND ORDER**

This appeal touches upon the extent of the automatic stay provided by Title 11 of the United States Code ("Code" or "Bankruptcy Code") to certain debtors upon the filing of a voluntary petition for bankruptcy relief and implicates the nature of a pawnbroker's rights under the Alabama Pawnshop Act ("APA"), Ala. Code § 5-19A-1 *et seq*.

In this appeal, Kisha Yvonne Daniel ("Daniel") challenges the Order Granting Motion ("Order") (Doc. 2-18; *see also* Doc. 58, BK Case No. 18-bk-33069[1]), issued by the United States Bankruptcy Court for the Middle District of Alabama ("Bankruptcy Court") on October 24, 2019. As its title reveals, the Order awarded the relief requested by TitleMax of Alabama, Inc. ("TitleMax") in its Motion to

---

[1] In this Opinion, case numbers are provided in any citation to documents filed in another court or proceeding.

1

Confirm Termination or Absence of the Automatic Stay ("Stay Motion"), as set forth in the Memorandum Opinion, (Doc. 2-17), released on that same October day ("Bk Opinion").

For the reasons set forth below, the Court affirms the Order.

## STANDARD OF REVIEW

This Court has appellate jurisdiction over this appeal from the final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a).

In an appeal of a bankruptcy court decision, the district court sits as an appellate court. *Williams v. EMC Mortg. Corp. (In re Williams)*, 216 F.3d 1295, 1296 (11th Cir. 2000). The district court reviews the bankruptcy court's findings of fact under the clearly erroneous standard and conclusions of law under the *de novo* standard of review. *In re Piazza*, 719 F.3d 1253, 1260 (11th Cir. 2013). "The court may affirm the bankruptcy court's judgment 'on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.'" *Perry v. United States*, 500 B.R. 796, 798 (M.D. Ala. 2013) (Watkins, J.) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On February 15, 2017, Daniel entered into a 30-day title pawn with TitleMax

concerning Daniel's 2004 Ford Expedition ("Ford" or "Expedition").[2] (Doc. 2-19 at 2; *see also* Doc. 2-14 at 13-14, 56, 59.)

The terms of the arrangement between Daniel and TitleMax ("Parties," collectively) were set forth in a five-page pawn ticket[3] ("First Ticket") that was executed by Daniel and TitleMax. (Doc. 2-19; *see also* Doc. 2-14 at 13-14.) This contract provided, *inter alia*, that the pawn would mature within 30 days on March 17, 2017, and in exchange, TitleMax would hold title in, constructive possession of, and a security interest in the Ford. (Doc. 2-19 at 2.) It further provided that Daniel agreed to deliver to TitleMax the endorsed certificate of title and extra keys to the Ford. (*Id.*)

Most crucially, the First Ticket contemplated that the Parties subsequently could renew the pawn. (Doc. 2-19 at 2-3.) To do so, Daniel was required to pay a pawnshop charge. (*Id.* at 3.) Alternatively, Daniel could redeem the Ford by remitting $2,160.37 to TitleMax. (*Id.* at 2.) However, no contractual provision compelled Daniel to redeem, renew or make any payment on the Ford. (*Id.*) Instead, if not redeemed within 30 days of its maturity, the Ford would be forfeited, and all right, title and interest in and to the Ford would vest in TitleMax. (*Id.*)

---

[2] Daniel described this vehicle as an "Explorer" in her petition. (Doc. 2-4 at 16.) Other sources refer to this vehicle as an "Expedition." (Doc. 2-19 at 2.) This Court uses the model information explicitly written in the relevant pawn documents. (Doc. 2-19 at 2.)

[3] In the relevant documents, as in this Opinion, the words "Pawn," "Pawn Ticket," "Ticket," and "Agreement" all refer to a signed written contract between the pawnbroker and pledger.

Daniel apparently chose not to redeem the Ford at the initial maturity and instead, although she somewhat disputes it, elected to repeatedly renew the pawn, as shown by exhibits in the record. (*See* Docs. 2-20 at 2; 2-21 at 2; 2-22 at 2; 2-23 at 2; 2-24 at 2; 2-25 at 2; 2-26 at 2; 2-27 at 2; 2-28 at 2; 2-29 at 2; 2-30 at 2; 2-31 at 2; 2-32 at 2; 2-33 at 2.)

In her filings below and before this Court, Daniel tells one tale for this steady drip. She acknowledges that she signed, some electronically, transaction-related documents on February 15, 2017, March 16, 2017, and November 29, 2017. (Doc. 2-14 at 58-60.) Daniel further admits to electronically signing and receiving receipts confirming the monthly payments she made on her pawn. (Docs. 2-34 to 2-47; *see also* Doc. 2-14 at 15-16, 57-58.)  Indeed, these documents evidence Daniel's payments to TitleMax during the months of March, April, June, July, August, October, and November of 2017 and January, February, March, April, May, June and August of 2018.  (Docs. 2-34 to 2-47.)  Daniel, however, disputes the *authenticity* of her purported electronic signatures on almost all of the subsequent pawn renewals, including those executed during the months of April, June, July, August, and October of 2017 and January, February, March, April, May, June and August of 2018.[4]  (Docs. 2-21 to 2-25; 2-27 to 2-33; *see also* Doc. 2-14 at 57-58;

---

[4] As the Parties acknowledge, the origins of this belief, whether right or wrong, lie in TitleMax's use of a program known as "DocuSign." (Doc. 2-17 at 4.) In the typical case, during the renewal process, a customer physically signs a pen pad, and this software captures that autograph for

4

Doc. 54 at 7, BK Case No. 18-bk-33069.)  As she has succinctly argued, "Daniel has 12 renewals without her signature."  (Doc. 55 at 4, BK Case No. 18-bk-33069.)

The last renewal pawn ticket is dated August 25, 2018. (Doc. 2-33.)  This final renewal stated that the amount of $2,152.61 was due on or before September 24, 2018. (*Id*.)

After this last renewal, however, Daniel neither paid nor renewed nor redeemed.  (Docs. 2-14 at 20-21.)  Instead, on October 26, 2018 ("Petition Date"), Daniel filed a petition ("Petition") under Chapter 13 of the Bankruptcy Code.  (Doc. 2-4.)  In this first filing, Daniel valued the Ford at $2,500, and pegged its mileage at 300,000. (*Id*. at 16.) She listed only one secured creditor—TitleMax—and a bevy of unsecured ones.  (*Id*. at 23-36.)

Concurrently with the Petition, Daniel submitted a proposed Chapter 13 plan ("Plan").  (Doc. 2-5.)  Therein, Daniel proposed to pay TitleMax for the Ford, and therefore effectively redeem the Ford over the Plan's 58-month lifespan. (Doc. 2-5; *see also* Doc. 2-14 at 56.)  She valued TitleMax's claim at $2,000, having subtracted an exemption of $500 from its asserted fair market value.  (Doc. 2-5 at 2.)  With a new interest rate of 5.25%, she offered adequate protection payment of $5 for a total

---

present and future use.  (*See* Doc. 2-17 at 4; *see also* Doc. 2-14 at 23-25.)  At least according to its representative, while TitleMax employs this technology in its every store, it generally limits its use to customers who are physically unable to sign the relevant documents. (Doc. 2-14 at 33-34.) Reliance on this program may explain why "[t]he signatures on the disputed pawn tickets are identical and appear to be computer-generated signatures." (Doc. 2-17 at 4.)

specified monthly payment of $108.  (Doc. 2-5 at 2.)  Having opted to pay off the entire balance via the Plan and retain possession, as the Bankruptcy Code allows, Daniel did not challenge TitleMax's lien, interest or right in the Ford, the invalidity of any pawn renewal, or her electronic signature on any of the pawn tickets.  (Doc. 2-5 at 2.)

Unsurprisingly, TitleMax responded in two ways to Daniel's bankruptcy submissions.  First, it filed an objection to the Plan.  (Doc. 2-6.)  Essentially, TitleMax claimed that Daniel had forfeited the Ford to TitleMax on October 24, 2018, because she had failed to redeem the Ford in the 30-day time period provided for in her last pawn.  (Doc. 2-6.)  As such, Daniel could not extend the redemption period over the 58-month life of the proposed Plan.  (Doc. 2-6.)  Second, on February 11, 2019, TitleMax filed its Stay Motion on the basis of this same argument. (Doc. 2-8.)

In response to TitleMax's filing, Daniel changed her strategy.  First, on May 30, 2019, she amended her schedules to dispute TitleMax's claim in the Ford.  (Doc. 2-12.)  Second, she filed an amended plan to remove payments to TitleMax.  (Doc. 2-11.)

After conducting an evidentiary hearing on May 30, 2019, the Bankruptcy Court entered its Order and Bk Opinion on October 24, 2019.  As set forth in the Bk Opinion, the Bankruptcy Court concluded that Daniel had "failed to timely redeem

the vehicle[] such that [it was] not property of the estate and [is] not protected by the automatic stay." (Doc. 2-17 at 15.) This appeal followed.

## DISCUSSION

This Court confronts only one issue on appeal: the merits of the Order. In her brief, Daniel takes forty-eight pages to articulate a singular but confusing theory: that, as a result of a defective and nonconforming pawn renewal in April 2017, TitleMax acquired (or was forfeited) ownership of and right in the Ford in May 2017 but that title and right reverted back to Daniel sometime thereafter because TitleMax violated the APA in May 2017 and did not retitle the Ford as required under the Alabama Uniform Certificate of Title and Antitheft Act ("AUCTAA"), Ala. Code § 32-8-1 *et seq*. Therefore, according to Daniel, the Bankruptcy Court granted relief from the automatic stay on the basis of a mistaken view that TitleMax was the owner of the Ford.

This result follows, Daniel argues, from the APA and AUCTAA. Under the APA, both a writing and signature are obligatory components for a valid pawn renewal. Since Daniel disputes that she signed, electronically or otherwise, pawn tickets for each renewal month, the first break in the monthly chain of pawn renewals, here April 2017, resulted in reversion (or forfeiture) of the title to TitleMax after maturity of the last acknowledged and properly executed pawn renewal, which was the March 16, 2017 renewal. As Daniel argues, "there can be no pawn

transaction without a pawn ticket." (Doc. 7 at 19.) This is true, according to Daniel, even though "the evidence is clear that . . . [she] appeared at the TitleMax store every thirty days or so and made payments." (*Id.* at 21.)

According to Daniel, the Bankruptcy Court erred when it found Daniel's twelve disputed electronic signatures, and therefore twelve renewal pawns, to be valid by looking to the Parties' "course of dealing" as evidence of Daniel's attribution of her electronic signatures. (*Id.* at 25.) In other words, in Daniel's view, the Bankruptcy Court could not consider extrinsic evidence in rebuttal to Daniel's testimony to determine if Daniel had electronically signed or entered into the April 2017 pawn, even if all of Daniel's other actions evidenced the existence of a pawn transaction. As Daniel argues, "the lack of signatures can simply be interpreted as 'no signatures exist.'" (*Id.* at 26.)

This complicated web that Daniel attempts to weave is of no avail because the end point remains the same – TitleMax's Stay Motion was properly granted.

## I. Daniel's Flawed Theory

Although the Bankruptcy Court concluded that title and right vested in TitleMax on October 24, 2018, due to Daniel's failure to redeem the Ford after the August 24, 2018, renewal, Daniel's focus on this holding's purported error wins her nothing at the end of the day. Assuming without deciding that Daniel is resoundingly correct on that point, Daniel's effort is doomed because there is nothing in generally

applicable non-bankruptcy law that resulted in title to the Ford reverting back to Daniel.[5]

First, Daniel cites § 5-19-7 of the APA and argues that TitleMax's violations of the APA in April 2017 and thereafter voided the pawn renewals purportedly executed during these months. Though Daniel makes much of § 5-19A-7 of the APA, she mistakes its import.

Pursuant to § 5-19A-7(a) of the APA, "[a] pawnbroker may contract for and receive a pawnshop charge in lieu of interest or other charges for all services, expenses, costs, and losses of every nature but *not to exceed 25 percent of the principal amount*, per month, advanced in the pawn transaction." Ala. Code § 5-19A-7(a) (emphasis added); *Austin v. Ala. Check Cashers Ass'n*, 936 So. 2d 1014, 1023 (Ala. 2005). Section 5-19A-7(b), in turn, reads: "[a]ny interest, charge, or fees contracted for or received, directly or indirectly, in excess of the amount permitted under subsection (a) shall be uncollectible and the pawn transaction shall be void." Ala. Code § 5-19A-7(b).

Under Daniel's argument, the first void pawn transaction would be the April 2017 pawn renewal. While that transaction and every transaction thereafter would be void under Daniel's theory, violations of the APA in April 2017 and thereafter

---

[5] As noted above, even though the Bankruptcy Court did not go in this direction in granting TitleMax's Stay Motion, this Court may affirm the Bankruptcy Court for any reason set forth in the record, whether or not that ground was relied upon or even considered by the court below.

had no effect on the validity of the March 2017 pawn transaction. The APA penalty scheme is forward in effect, not backward-looking, by design. If TitleMax had already gained unfettered ownership and right by virtue of the March 16, 2017, pawn renewal and Daniel's failure to redeem, an otherwise void April 2017 transaction could not divest TitleMax of an ownership interest resulting from that valid pawn. Logically, what it had already gained during the existence of a prior valid agreement cannot be unmade by a subsequent one's invalidity, a power utterly absent from the statutory text's plain import. As such, § 5-19A-7(b) does not support Daniel's position in this appeal.

Danial also argues that since TitleMax did not promptly retitle the Ford into its name as required by § 32-8-46 of the AUCTAA, title and right remained with or was forfeited back to Daniel. Daniel's reliance on § 32-8-46 of the AUCTAA is similarly unavailing. That statute concerns the *involuntary* transfer of ownership interests in vehicles, such as a repossession by a secured creditor. Ala. Code § 32-8-46. The type of transfer contemplated under Daniel's theory is a *voluntary* one that is not conditioned upon temporal title re-issuance requirements.

In fact, this statutory provision presents at least three problems for Daniel, ones she does not address.

First, once Daniel pawned the Ford, she voluntarily consented to a subsequent transfer of the Ford by elective forfeiture under the First Ticket's original conditions.

Simply put, through her prior consent, the subsequent transfer effectuated by her elective decision not to redeem or renew was not an involuntary transfer. *See Mattheiss v. Title Loan Express (In re Mattheiss)*, 214 B.R. 20, 32 (Bankr. N.D. Ala. 1997) (construing 11 U.S.C. § 522(f)), *disagreed with on other grounds*, *Charles Hall Motors, Inc. v. Lewis (In re Lewis)*, 137 F.3d 1280, 1282 (11th Cir. 1998)). Despite Daniel's conjectures, it is not clear that such pawn transfers are covered under this provision of the AUCTAA.

Second, to the extent that forfeiture constitutes an involuntary transfer, this particular section of the AUCTAA primarily deals with notice, and it constitutes part of an article focused on certificates of title. It does not say, as Daniel seemingly believes, that even an unambiguous failure to comply negates or voids an otherwise automatic transfer. No language such as "void," "forfeit," or the like, as used in, for example, the APA, appears within its text. *Cf.* Ala. Code § 5-19A-6 ("Pledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker."); *In re Mattheiss*, 214 B.R. at 32 (construing statute). These words and omissions are not insignificant glitches, but telling indicia of statutory intent.

Third, as set forth in yet another paragraph within this section, its notice provisions simply "shall not apply . . . to a motor vehicle transferred pursuant to

11

documents creating a lien or other security interest in the motor vehicle." Ala. Code § 32-8-46(a)(3). Based on the APA and the certificate of title, TitleMax also held such a lien or other security interest. *See* Ala. Code § 5-19A-2(3).

Indeed, another judge of this district's bankruptcy court has already recognized that the mechanisms of transfer and assignment under the AUCTAA do not trump the legal title obtained by a pawnbroker under a pawn ticket. In that court's words, "the legal title a pawnbroker obtains to a vehicle from the expiration of a redemption period on a pawn contract, as provided by the Alabama Pawnshop Act, is valid even though the transfer does not comply with AUCTAA." *In re Jones*, 544 B.R. 692, 699 (Bankr. M.D. Ala. 2016) (citing *In re Davis*, 269 B.R. at 916). By extension then, if TitleMax's legal title, as against Daniel, is not affected by the AUCTAA, then TitleMax's failure to re-title it under the AUCTAA is not either.

In light of the foregoing, neither statutory argument advanced by Daniel results in title and right vesting or forfeiting back to her own person prior to her bankruptcy filing.

While this result would nonetheless leave Daniel's theory of a common law waiver theoretically viable, Daniel herself consigned it into oblivion by failing to raise it with the Bankruptcy Court.[6] *See, e.g.*, *Blue Martini Kendall, LLC v. Miami*

---

[6] Daniel raised a voidance argument under the APA, but never a waiver argument under the AUCTAA or by inaction.

*Dade Cty. Fla.*, 816 F.3d 1343, 1349 (11th Cir. 2016) (citing *Access Now, Inc. v. SW Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004)).

In short, under Daniel's theory that title to the Ford vested in TitleMax on April 17, 2017, and with no valid legal grounds for title and right having revested back into Daniel prior to Daniel's bankruptcy filing, the Ford was not property of the bankruptcy estate, and TitleMax's Stay Motion was due to be granted, although for reasons different from those provided by the Bankruptcy Court.

## II.     The Bankruptcy Court's Stated Reasons

In granting TitleMax's Stay Motion, the Bankruptcy Court based its decision that the Ford was not the property of the bankruptcy estate on one finding: that Daniel's right to redeem the Ford expired on October 24, 2018. Although not expressly stated, it therefore implicitly determined the August 24, 2018, pawn transaction to be valid.

The crux of Daniel's challenge on appeal is that the August 24, 2018, pawn transaction, like every purported renewal transaction since April 2017, was invalid and void because Daniel, through her testimony, disputed the authenticity or attribution of her electronic signatures on the pawn renewals. This invalidity, absolute and irredeemable, arises from TitleMax's alleged failure to present testimony from a TitleMax representative that rebutted Daniel's hearing testimony concerning the purported April 2017 pawn renewal. If so, the last valid pawn dates

13

to March 16, 2017, which had a maturity date of April 15, 2017. Under Daniel's logic, title to the Ford vested in TitleMax in May 2017 when the parties failed to properly renew the pawn in April 2017 and Daniel failed to redeem, and therefore Daniel could not thereafter legally pawn a vehicle that she no longer owned.

TitleMax rejects this reasoning. As it contends, an executed pawn ticket existed on March 16, 2017, and the Parties had always intended to renew the pawn monthly as evidenced by, among others, the electronic pawn renewal tickets and Daniel's regular monthly payments. At trial, Daniel acknowledged signing tickets dated February 15, March 16, and November 29, 2017, acknowledged making monthly payments, and in her petition, acknowledged listing the Ford as an asset and the total sum due under the pawns as a debt she owed. All these apparent verities created an ambiguity and question of fact that the Bankruptcy Court properly could resolve by looking at the Parties' overall course of dealings.

The Bankruptcy Court, upon hearing the evidence presented by the Parties, agreed with TitleMax. It concluded that electronic signatures were authorized under the Alabama Uniform Electronic Transaction Act, Ala. Code § 8-1A-1 *et seq*. (Doc. 2-17 at 12.) This statutory authorization, plus the Bankruptcy Court's factual conclusions that the Parties had acted consistent with an ongoing relationship of monthly pawn renewals and that Daniel provided for the TitleMax debt in her initial

bankruptcy schedules and initial bankruptcy plan, resulted in the Bankruptcy Court concluding that the Ford was not forfeited to TitleMax in 2017. (*Id*. at 11.)

As it concerns the novel issue of whether the Bankruptcy Court could consider extrinsic evidence of a pawn transaction, this Court must conduct *de novo* review.

In this state, the APA governs pawn transactions. *See* Ala. Code § 5-19A-1 *et seq*. The APA defines a pawn transaction as "[a]ny loan on the security of pledged goods or any purchase of pledged goods on condition that the pledged goods are left with the pawnbroker and may be redeemed or repurchased by the seller for a fixed price within a fixed period of time." Ala. Code § 5-19A-2(3). The APA clearly anticipates extensions of the maturity date of an original pawn transaction by authorizing a subsequent pawn charge for the succeeding month. Ala. Code § 5-19A-7. As another judge of this district observed as to this section, "[e]ven though other sections have specific requirements for pawn tickets and their contents at the time of the execution of a pawn transaction, this section of the statute does not make any requirements for creating separate or additional pawn tickets." *In re Gunn*, 387 B.R. 856, 861 (M.D. Ala. 2008) (discussing § 5-19A-7 of the APA). Plainly read, this provision "thus evidences that the legislature did not intend for the creation of additional pawn tickets upon the extension of the original one." *Id*.

In so asserting, *Gunn* discerns what the statutory text makes obvious. As written, the APA contains no explicit requirements for the creation of separate or

additional pawn tickets. It also "does not prohibit extensions or renewals of an initial maturity date," and it treats such extensions as distinct from the cancellation or the satisfaction and replacement of a lien. *Gunn v. Title Max of Ala., Inc. (In re Gunn)*, 317 F.App'x 883, 887 (11th Cir. 2008). Since the APA both allows for such extensions and lacks an invalidity penalty for lack of documentation similar or identical to an original pawn transaction, it cannot be reasonably read to regard the failure to strictly comply with the APA, particularly § 5-19A-4, as decisive proof of the invalidity of the underlying transaction under Daniel's theory. Consequently, TitleMax's failure to present renewal tickets at trial, with signatures that Daniel does not dispute, cannot result in *per se* voidance of the purported April 2017 transaction or any thereafter.[7] To do so would be to impute into the APA a textual command utterly divorced from its written text.

In relevant part, the APA provides only two circumstances when a pawn transaction is void – (i) when excessive interest, charges or fees are charged by the pawnbroker, *see* Ala. Code § 5-19A-7(b), and (ii) when the pawnbroker enters into a transaction without being licensed, *see* Ala. Code § 5-19A-13(e). Nowhere does

---

[7] In reaching this conclusion, the Court notes that the renewal transactions at issue are for 30-day periods of time for sums less than $25,000. Putting aside the existence of the APA, courts are permitted to accept extrinsic evidence of such a short-term loan agreement without violating the statute of frauds. *Rozell v. Childers*, 888 So. 2d 1244 (Ala. Civ. App. 2004) (concluding that statute of frauds did not preclude claims of the existence of a $12,000 loan based on oral trial testimony).

16

the APA provide that a transaction is void[8] because a pawnbroker failed to use and maintain a particular form of ticket. Instead, the remedy afforded by the Act for such a violation is the suspension or loss of the pawnbroker license and, in the case of willful violations, a misdemeanor criminal charge. *See* Ala. Code §§ 5-19A-13, 17. Under well-settled rules of statutory construction, that the Legislature saw fit to provide a remedy in one form precludes courts from inferring additional ones. *See Sandoz, Inc. v. Amgen, Inc.*, 137 S. Ct. 1664, 1675 (2017) ("Where, as here, a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.").

This conclusion compels another: because the APA does not predicate invalidity on documentary proof, it does not bar any tribunal, including the Bankruptcy Court below, from accepting extrinsic evidence of the existence of a pawn transaction renewal, especially when the pledgor places her attribution to an electronic signature in dispute by contesting its legitimacy. Rather, no other approach would cohere with the APA, as no other means can be credibly shown to establish such an intent, or the underlying contract, which imposes no such requirement. In effect, to prohibit such evidence would graft a new obligation onto an otherwise silent statute, a task far beyond the competence of the judiciary. Indeed,

---

[8] In fact, the APA specifically contemplates a circumstance when a pledgor may lose or destroy a ticket, and in that circumstance, the transaction is not deemed to be nonexistent. Ala. Code § 5-19A-9.

17

especially when the Parties have produced proper documentation of the original pawn transaction and their actions otherwise show monthly pawn renewals thereafter, as here, there can be no better evidence of the Parties' true objectives.

The second issue, and the one that Daniel devotes a significant amount of argument to, is the Bankruptcy Court's factual finding that, based on the extrinsic evidence presented, the Parties did not intend for the Ford to be forfeited to TitleMax in 2017 but rather intended to enter into monthly renewals of the pawn.  In other words, the extrinsic evidence, including the Parties' course of dealings, also confirmed Daniel's attribution to her electronic signatures on the pawn renewals. On this issue, the Court must apply the limited and deferential clearly erroneous standard of review.  *In re Piazza*, 719 F.3d at 1260. Having reviewed the record, the Court concludes the Order on this factual finding is due to be affirmed under the clearly erroneous standard.

Opting for fireworks, Daniel tried, but fails, to obscure the substantial evidentiary support marshaled by the Bankruptcy Court.  As it concerned the April 2017 transaction, evidence showed that Daniel made a cash payment for the pawn charge in April and received a receipt from TitleMax confirming that payment. Other evidence from a pawn transaction history report for Daniel attested to the original pawn transaction and its repeated 30-day renewals.  All these buttresses were supplemented by testimony from a TitleMax representative who stated that

TitleMax did not permit partial payments and instead required the pledgor to pay a sufficient amount to redeem the vehicle or pay the monthly renewal amount. Of course, one cannot ignore that Daniel was seemingly unbothered by monthly receipts showing payments to TitleMax and even listed the debt in her Petition, thus imbuing it with presumptive legitimacy as a matter of bankruptcy law. In fact, even if no other damning evidence could be found in a record replete with such information, Daniel's decision to schedule this debt, especially with the assistance of legal counsel, would be enough to establish its actuality and thus be far more than sufficient to justify the Bankruptcy Court's evidentiary sifting.

Accordingly, even while Daniel disputes TitleMax's version of the facts, the Court cannot say that the Bankruptcy Court clearly erred in finding that the Parties intended to and did renew the pawn in April 2017 and every month thereafter.

## CONCLUSION

For the foregoing reasons, Daniel's appeal of the Order, (Doc. 2-18), is DENIED and the Bankruptcy Court's holdings are AFFIRMED. The Clerk of the Court is directed to mark this matter CLOSED.

DONE and ORDERED, this the 26th day of August 2020.

/s/R. Austin Huffaker, Jr.
UNITED STATES DISTRICT JUDGE